## CIRCUIT COURT OF THE CITY OF NORFOLK

Robert T. Sherlock

v.

Medical Center Hospitals,
Nephrology Associates of Tidewater, Ltd.,
and Herbert M. Brewer, M.D., Inc.

April 8, 1986

Case No. (Law) L-85-1372

By JUDGE JOHN W. WINSTON

Brewer seeks summary judgment in its favor at this time. Rule 3:18, Supreme Court of Virginia. Brewer argues that it had no legal duty here to oversee the hospital's nursing staff and that it was entitled to proceed on the basis that those nurses would attend to their regular routine duties in the absence of the physician without his instructions.

Sherlock opposes the motion, not because any of the facts are in dispute but because he says that Brewer's absence at the time of the accident does not exonerate the doctor as a matter of law. He argues that Brewer knew or should have known better than any other person Sherlock's true condition and the effects of the combination of drugs being administered. He says that a physician is duty bound to give the nurses and others instructions necessary to ensure the safety of the patient.

The facts on which the sides now rely are set out in Brewer's motion for summary judgment and in the documents attached to that motion. And they are additionally set out in Sherlock's memorandum in opposition (which the court will treat for the purpose of this ruling as a *pleading*) and in the documents attached to that memoran-

dum. (That memorandum is identified as a *pleading* because Sherlock must file one in this summary judgment case if he wishes its contents considered there. Rule 3:18, Supreme Court of Virginia).

Those uncontradicted facts establish that Sherlock was a very sick man when he was admitted to Norfolk General Hospital on July 1, 1980, to be started on renal dialysis. At that time he was described as having hypertensive arteriosclerotic cardiovascular disease, cardiomegaly, congestive heart failure, grade three retinopathy accelerating (malignant) hypertension, further complicated by end stage renal failure, end stage renal disease; chronic renal insufficiency, severe. He was admitted that evening as a result of progressive deterioration characterized by marked weakness, fatigue, pruritis, night sweats, dyspnea. His pre-admission physical exam revealed a very severely ill, extremely pale 56 year old male with a pulse of 72 and blood pressure of 160/80. There was a 2+ pitting ankle edema and the dorsalis pedis pulses could be felt though the posterior tibial pulses could not be felt. His abdomen was soft, liver was palpable two finger breadths below the right costal region. Examination of the lungs revealed some bibasilar crepitant moist rales. Heart was enlarged, rhythm regular, and there was a grade II apical systolic murmur. The pulmonic closure sound was increased in intensity and indicative of high left ventricular filling pressure. There were no gallops or rubs. Venous pressure was moderately elevated.

Impression:
1. Hypertensive arteriosclerotic cardiovascular disease. Cardiomegaly. Congestive heart failure.
2. Chronic renal disease, severe, end stage renal failure with marked anemia.

On July 2, 1980, Sherlock was examined by a consultant, Dr. Wombolt. His report of that date includes a history that "Over the last days he (Sherlock) has gotten increasing dyspnea, marked weakness, complains of wombling when he walks with some loss of balance. He came to the emergency room on 7/1 with these symptoms. . . ."

The doctors' orders show that Sherlock was prescribed Benadryl, Chloral Hydrate, and Dalmane in the hospital before July 5, 1980. The nurses' notes reveal that at

1900 hours and at 2400 hours on July 3, 1980, he was given Chloral Hydrate for sleep. At 0100 hours on July 4, 1980, he was noted to be sitting on the side of his bed, "unable to sleep" he said. At 0200 hours the nurse noted that he was up and about his room, talking loudly, somewhat confused, was encouraged to get back in bed and to try to sleep. At 0300 hours the nurse noted him again up in his room, put him back to bed and instructed him to stay there. Then at 0345 hours the nurse found him sitting on the floor, apparently uninjured, put him back to bed and again instructed him to use the call light for assistance. A Posey chest restraint was put on him also.

Counsel for Sherlock summarized those nurse's notes for the remainder of that day and of July 5: "Throughout the day of July 4, 1980, the patient remained confused and deteriorated to the stage of needing assistance when ambulating. This confused condition remained throughout July 5, 1980, when at 9:00 P.M. Mr. Sherlock was given Dalmane, after which he fell again and fractured his hip at 11:20 P.M. on July 5, 1980."

The notes themselves reflect that at 1600 hours on July 4, 1980, Sherlock seemed confused and rambling when talking. At 1700 hours he ate a good evening meal. At 1900 hours he seemed restless. At 2200 hours he was given Dalmane for sleep. At 2230 hours he was quiet. At 2400 hours he was awake, wife with him. Then at 0145 hours on July 5, 1980, he walked to the bathroom with his wife's assistance. And at 0150 hours he returned to the room with assistance. He was noted to be confused and talking irrationally, cooperative and obeys commands, (?) of mouth very dry and ice chips offered, taken and tolerated. Again at 0330 hours he went to the bathroom, assisted by his wife, was noted as still weak but walking better than earlier, still confused. Then at 0530 hours he again went to the bathroom with help from his wife, spoke more rationally (?)(?), acted stronger, stood at sink to clean teeth and to shave with wife's help. Returned to chair, visited with wife. Slept poorly. At 0830 hours and at 1330 hours respectively he ate well his breakfast and his lunch. At 1600 hours it was noted he was still very confused. At 1700 hours he ate (his dinner) fairly well, went to bathroom, ambulating fairly well but was unsteady on his feet and confused about where to go. At 1830 hours he was noted to be resting well in bed

with his wife at his side. Then at 2100 hours he was given his evening medicine Dalmane, voiced no complaints. At 2200 hours he was resting well. Then at 2320 hours the following nurse's note appears: "Loud noise heard from patient's room. Found patient resting (?) on floor. Instructed before and after to use call light. Side rails adjusted up; before and after patient was found on floor. (?) 200/110 80-20. Supervisor notified."

Mrs. Sherlock who was allowed to stay with him at the hospital was not in the room at the time he fell on July 5, 1980, fracturing his hip.

Sherlock relies on *Fox v. Mason*, 139 Va. 667 (1924), to establish a duty on the physician to instruct a nurse or attendant in the care to be given his patient. The Supreme Court of Virginia there spoke of the duties of a surgeon after an operation. In that context it said (page 672): "the care and diligence, and skill required, relates to professional duties and not to nursing and providing necessaries, etc. He is not bound to nurse his patients and provide for them, though he is required to instruct others how to do it."

From this recitation of the law and from the original pleading filed by plaintiff it is clear that Brewer's alleged duty here was to warn the room nurse employees of the hospital to be especially careful with their patient because he was seriously ill, was to be administered potentially disabling drugs, and could easily fall and injure himself if not closely attended and safeguarded by them. But all of those conditions and possibilities were just as well known to the hospital's nurses on duty as they were to Brewer so that the stated duty to warn did not exist under those circumstances. Furthermore, even if such duty had existed here the failure of Brewer to warn the nurses could not have been a proximate cause of Sherlock's July 5 fall and hip injury.

Hence the uncontradicted facts require a granting of summary judgment because in this case reasonable men, after weighing the evidence and the inferences therefrom, could reach but one conclusion, namely, that Brewer was not guilty of any negligence that proximately caused Sherlock's injury. The use of a summary judgment motion, just like a motion to strike, is appropriate in this case where it is conclusively apparent that Sherlock has proven no cause of action against Brewer.